UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PET FOOD EXPRESS LTD., | No. C 09-1483 MHP |
| Plaintiff, | |
| v. | **MEMORANDUM & ORDER** |
| ROYAL CANIN USA INC., | Re: Defendant's Motion for Summary Judgment; Plaintiff's Motion for Leave to Amend |
| Defendant. | |

Pet Food Express Ltd. ("plaintiff" or "Pet Food Express") brought this action against Royal Canin USA Inc. ("defendant" or "Royal Canin") alleging breach of contract. Defendant asserted the defense of illegality and counterclaimed for a declaratory judgment of the same and for rescission and restitution. Two motions are now before the court. Defendant moves the court to grant summary judgment in its favor on plaintiff's breach of contract claim, arguing that the contract is illegal under California antitrust law. Plaintiff moves to amend its complaint to include a claim for rescission. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

I.  The Parties

At all relevant times, plaintiff has been a corporation organized under the laws of, and having its principal place of business in, California, and defendant has been a Delaware corporation having

its principal place of business in Missouri. *See* Docket No. 1 (Compl.) ¶¶ 3-4; Docket No. 20 (Answer) at 1-2. Plaintiff is a retail chain that sells premium pet food; it started at a single location in San Francisco and now has thirty-five stores in the greater Bay Area. Docket No. 61-1 (Levy Dec.) ¶¶ 20-21. Unlike its local chain competitors, plaintiff invests heavily in employee education and training and customer education. *Id.* ¶ 21. Defendant is a manufacturer and distributor of premium pet food and pet care products. Answer at 2.

II. The Contractual Relationship

The parties entered into their first agreement in 1997 ("the 1997 agreement").[1] In October 2003, plaintiff filed a breach of contract suit against defendant in Alameda County Superior Court, alleging defendant violated the terms of the 1997 agreement. Specifically, plaintiff alleged defendant had begun selling its product lines in stores belonging to Pet Food Express's competitors Petsmart and Petco in Pet Food Express's exclusive territory, in violation of the agreement. Levy Dec. ¶ 13.

In February 2004, the parties signed an "Amended and Restated Retailer Purchase Agreement" ("the 2004 agreement"), which became effective following plaintiff's request for dismissal with prejudice of the lawsuit in Alameda County. Compl. ¶¶ 5-6; Docket No. 1, Exh. 1 ("2004 Agreement") at 4; Answer at 1. By the 2004 agreement defendant appointed plaintiff as a "market developer," through December 31, 2017, for certain of defendant's products within a specified territory. *See* 2004 Agreement at 1. Plaintiff assumed eight enumerated obligations, which included: placing defendant's products in a "prime selling location" at each of its outlets; sending its employees to periodic sales meetings and seminars hosted by defendant; establishing sales promotion programs to increase consumer awareness of defendant's products; and remaining current in its payment obligations to defendant. *Id.* at 1-2. In return, defendant obligated itself to, among other things, pay plaintiff a one-time volume rebate, a promotional allowance and a market development allowance ("MDA"). The MDA provision reads in its entirety:

> So long as [Pet Food Express] is in compliance with its duties and obligations, [Royal Canin] shall pay [Pet Food Express] an annual market development allowance funded by [Royal Canin] each year in the amount of five percent (5%) of the aggregate annual dollar volume of Products shipped by [Royal Canin] into the Territory directly and of Products shipped by [Royal Canin] to distribution facilities outside the Territory where such Products are sold at retail within the Territory, based upon [Royal

2

> Canin's] wholesale price for the Products. The Territory shall include any new county or counties in which [Pet Food Express] opens an Outlet before the end of the applicable calendar year, so long as such Outlet is comprised of at least 2,000 square feet and is intended to operate as a permanent, as opposed to temporary or seasonal, location. Such allowance, if any, shall be payable on or before March 15 of each year and shall be accompanied by a written statement from [Royal Canin] setting forth the calculations used in making such payment.

*Id.* at 3.

The 2004 agreement also provides that defendant could terminate that agreement under certain circumstances, such as plaintiff's failure to perform its duties and obligations, plaintiff's failure to increase its purchases of defendant's products year-over-year, or a change in plaintiff's ownership that adversely affected defendant's business within the defined territory. *Id.* The 2004 agreement "expressly supersede[d] and replace[d]" the 1997 agreement "in all respects." *Id.* at 4. It also contains a confidentiality clause which reads in its entirety:

> [Pet Food Express] acknowledges and agrees that all data in this agreement constitute [Royal Canin's] "Confidential Information". As an inducement to [Royal Canin] to enter into and perform its obligations under this Agreement, [Pet Food Express] agrees to keep all of the Confidential Information in the strictest confidence and shall not use or disclose to third parties any of the Confidential Information, except as expressly authorized in the course of performing its duties hereunder.

*Id.*

III. Performance of the 2004 Agreement

Pursuant to the provisions of the 2004 agreement, defendant tendered annual MDA allowances to plaintiff. On March 16, 2009, plaintiff's president, Michael Levy, contacted defendant to inform it that it was in breach of the agreement because the annual MDA check for 2008 had not been paid by the March 15 deadline. Levy Dec. ¶ 18. After the parties exchanged several telephone and email messages, defendant's general manager, Joe Flanigan, arrived at Levy's office unannounced on or about March 25, 2009. Flanigan expressly repudiated the 2004 agreement, stating that he would not tender the MDA check, which had a payment amount between $310,000 and $320,000, unless plaintiff signed a new agreement that Flanigan had brought with him. Defendant's proposed new agreement would shorten the term of the arrangement, remove the exclusivity, and eliminate the MDA provision. Levy refused to sign the proposed new agreement, and defendant continued to withhold the 2008 MDA payment. *See id.* at 18-19.

3

Defendant alleges it refused to pay the MDA because it determined that the promotional allowances and MDA payments it had been making to Pet Food Express since 2004 were illegal and unenforceable under section 2(d) of the federal Robinson-Patman Act, 15 U.S.C. § 13(d), and the parallel provision of California's Unfair Practices Act (UPA), codified at California Business and Professions Code section 17045 ("section 17045").

According to Flanigan, since the time of execution of the 2004 agreement, none of defendant's other customers in the United States received "a benefit comparable to the MDA." Docket No. 54-2 (Flanigan Dec.) ¶ 4. Flanigan also avers that "[u]nder no circumstances is any other [Royal Canin] customer entitled to rebates, refunds, commissions, or discounts based on sales made by its competitors" and "no customer has ever been informed of the benefits granted by the 2004 Agreement to [Pet Food Express]."[2] Id. ¶¶ 5-6. Defendant admits it commonly used a standard-form agreement containing an MDA provision between 1997 and 2002 as an incentive for retailers to provide market entry for its new line. Docket No. 63 (Def.'s MSJ Reply) at 2.

IV. Procedural History

On March 26, 2009, plaintiff filed suit against defendant in the Superior Court for Alameda County for breach and repudiation of the 2004 agreement. On April 6, 2009, plaintiff filed a substantially similar action in this court. Defendant removed the state action to federal court, and the two actions were related and consolidated pursuant to 28 U.S.C. section 1332. Defendant answered and counterclaimed on May 21, 2009. Plaintiff answered defendant's counterclaim on June 12, 2009. On July 28, 2009, the court denied plaintiff's motion for writ of attachment. Defendant filed its motion for summary judgement on November 23, 2009, and plaintiff filed its motion to amend on November 30, 2009.

LEGAL STANDARD

I. Summary Judgment

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving

4

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-255 (1986). A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make credibility determinations. *Id.* at 255. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 250.

II. Leave to Amend

The court should freely give leave to amend pleadings when justice so requires. Fed. R. Civ. P. 15(a)(2). In assessing the propriety of a motion for leave to amend, the court considers five factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiffs have previously amended their pleading. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004) (citing *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)). Although the policy of freely granting leave to amend is to be applied with extreme liberality, *Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted), futility alone can justify the denial of a motion for leave to amend, *Nunes*, 375 F.3d at 808.

DISCUSSION

I. Defendant's Motion for Summary Judgment

According to defendant, plaintiff seeks through its breach of contract claim to enforce a contract provision that is illegal and unenforceable under California law. Specifically, defendant asserts that the MDA provision of the 2004 agreement violates the following provision of California's Unfair Practices Law[3]:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain

5

> purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

Cal. Bus. & Prof. Code § 17045. As relevant to the instant case, this statutory language may be read to contain four discrete elements: (1) a payment of the type described in the statute (2) which is secret (3) and injures a competitor (4) and tends to destroy competition. *See, e.g., Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 212 (1993). An arrangement is not rendered unlawful by section 17045 unless each of these elements is met.

As to the secrecy element, there is no dispute that defendant routinely entered into MDA agreements during the late 1990s. Def.'s MSJ Reply at 2-3; *see also* Docket No. 61-23 (Novotny Dec.) ¶¶ 7-13.[4] Nor is it disputed that defendant is not presently a party to any contract containing an MDA with any customer except plaintiff, or that defendant has not informed any of its other customers about the MDA with plaintiff. Defendant argues that the agreement with plaintiff was "secret" because it was unique insofar as it provided for payments based partly on the sales of plaintiff's competitors, rather than strictly plaintiff's own sales, and because (the court should apparently infer) no other customer had reason to believe defendant had continued to pay such an MDA to plaintiff after defendant had stopped agreeing to MDAs with other customers.

Defendant's arguments are unpersuasive. Firstly, defendant has presented nothing but the terse declaration of its president, which is wholly lacking in particulars, to support an inference that the deal with plaintiff was secret. In light of the evidence that hundreds of other Royal Canin customers participated in MDA agreements in the years immediately preceding the 2004 agreement, defendant's evidence is insufficient to support an inference that the 2004 agreement was actually a secret in the industry. At most, this is a disputed issue of material fact. Secondly, defendant's assertions that the agreement was secret for the purposes of section 17045 ignore the relevance of the confidentiality provision's non-reciprocal nature where defendant is relying upon the defense of illegality. A contract is properly held unenforceable pursuant to the doctrine of illegality only where the party asserting the defense is incapable of following both the contract and the law. If there are, on the other hand, facts or circumstances under which the contract could be held valid, the defense of

illegality will not lie. *See, e.g., Gelb v. Benjamin*, 78 Cal. App. 2d 881, 884 (1947); *Bernard v. Sloan*, 2 Cal. App. 737, 748 (1906). Here, the confidentiality provision of the 2004 agreement runs in only one direction. *Plaintiff*, as an inducement to defendant to enter the contract, agreed to keep the agreement in the strictest confidence except as expressly authorized by defendant. *See* 2004 Agreement at 4. Under no plausible reading of the provision does *defendant* have an obligation to maintain the confidentiality of the agreement. Neither as a matter of law nor of equity should a party prevail in invalidating a contract on the basis that its secrecy violates the law when that party has no obligation to keep the contract secret. Because the provision requiring secrecy binds only plaintiff, it has always been within defendant's power to adhere both to the contract and to the law. For this reason, defendant's protestation that plaintiff is seeking enforcement of an illegal provision is without merit.

Even if defendant had established the secrecy element of a section 17045 violation, its motion would founder on the "injury of a competitor" element. Firstly, defendant has failed to articulate a coherent theory as to how the MDA harms competitors. Defendant first argues that other retailers which purchase defendant's products in the same geographic area have been victims of price discrimination. *See* Docket No. 54 (Def.'s MSJ) at 7. Logically, since plaintiff receives payments from defendant, a unit of Royal Canin pet food would in effect cost less for plaintiff than for a competitor receiving no payment, a circumstance which might allow plaintiff to undersell its competitors and establish a monopoly.[5] Defendant seems to contend, however, that the problem is actually that plaintiff may set its prices too high and decline to vigorously compete with other retailers because plaintiff is enriched to some degree each time one of its competitors sells defendant's products in the territory. *See* Def.'s MSJ Reply at 11. The failure of a single competitor to vigorously compete in a field with several players hardly leads to a necessary conclusion that its competitors have been harmed by such failure. In any event, defendant's theory of competitive injury is so underdeveloped as to leave the court with no clear picture of the potential harm perceived by defendant.

Secondly, defendant has not provided any evidence of actual harm to a competitor. A serious attempt to establish a breach of the antitrust laws requires the development of at least some evidence concerning factors such as market definition (e.g, is the relevant market one for pet food, "premium" pet food, Royal Canin pet food, or something else?), the absence or ubiquity of similar discounts in the industry,[6] the prices offered by plaintiff as compared to those of its competitors, and indicia that competitors have actually suffered some loss in sales or other harm.

Relying on *Eddins v. Redstone*, 134 Cal.App.4th 290, 332 (2005), defendant asserts that actual harm is proved anytime there is price discrimination. This claims too much from the cited language that when "a purchaser has no choice but to purchase upon 'fundamentally different terms and conditions', because the terms and conditions given to the favored purchaser are neither available to nor known by the disfavored purchaser, it is difficult not to conclude that some form of price discrimination may have occurred." *Id.* A party seeking to establish liability on summary judgment must show more than that "some form of price discrimination *may* have occurred". This argument also ignores the dependent clause that " neither favorable terms were available nor known" by the competing purchaser, which as explained herein have not been established. Finally, even if the court were to conclude that price discrimination has occurred, defendant must still show harm to a competitor.

Neither of the other cases relied upon by defendant supports these arguments. The *Diesel* court found the "injury of a competitor" element to be met in a case where the party alleging a section 17045 violation had introduced evidence of actual injury, including testimony that the competitor had registered a drastic decline in its gross sales and profits during the relevant time period. 16 Cal. App. 4th at 213. Unlike the instant defendant, the party in *Diesel* alleging the section 17045 violation had presented more than the mere evidence of differential pricing agreements. In *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309 (2004), the defendant to the section 17045 challenge did not dispute the plaintiff's factual allegations of harm. *Id.* at 333. That court also had substantially more evidence before it than is present here concerning the nature of the market and the alleged competitive injuries. *See id.* at 315-16.

8

Accordingly, even if it were assumed that the contract in the instant action creates "price discrimination," an issue which the court does not reach, defendant has pointed to no authority, and the court is aware of none, actually establishing that injury of a competitor will always be conclusively presumed whenever there is "price discrimination."

Because defendant has failed to establish as a matter of law either that the MDA provision results in payments that are properly characterized as "secret" or that there has been any injury to a competitor, the court cannot grant defendant's motion for summary judgment. The court does not reach the parties' arguments concerning the other elements of section 17045, including whether the MDA payments are "unearned discounts."[7] Nor does the court reach plaintiff's contention that the MDA provision falls within the "functional classification" exception to section 17045 codified at section 17042 of the California Business and Professions Code[8] or plaintiff's argument that the motion should be denied pending further discovery pursuant to Federal Rule of Procedure 56(f).

II.  Plaintiff's Motion to Amend

Plaintiff states that it has moved to amend its complaint "to vest the Court with equitable powers to restore the parties to their former positions should the Court, as trier of fact, agree with [Royal Canin's] counterclaim that the agreement is illegal." Pl.'s Mot. to Amend at 3-4. Specifically, plaintiff seeks to add rescission of the 2004 agreement as a "new claim for relief." *Id.* at 3. Rescission is a remedy, not a claim. *See, e.g., Ojavan Investors, Inc. v. Cal. Coastal Comm'n*, 54 Cal. App. 4th 373, 392 (1997); *Hafiz v. Greenpoint Mortgage Funding, Inc.*, 652 F. Supp. 2d 1039, 1048 (N.D. Cal. 2009) (Alsup, J.). Plaintiff has already prayed "[f]or such other legal and/or equitable relief as the Court deems just and proper," Compl. at 4, and plaintiff's pleading can in any event neither vest nor divest the court of its equitable powers. Accordingly, there is no need at this time to analyze the timeliness of plaintiff's motion or the hypothetical appropriateness of rescission. In the event that defendant should ultimately prevail in showing the contract to be unenforceable, the court can consider the range of equitable remedies as appropriate at that time.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED, and plaintiff's motion for leave to amend is DENIED.

IT IS SO ORDERED.

Dated: February 16, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

# ENDNOTES

1. Pet Food Express entered into the 1997 agreement with Pet Products Plus. The parties agree that Royal Canin is the successor-in-interest to Pet Products Plus.

2. Plaintiff's papers quoted at length alleged deposition testimony wherein Flanigan admitted he thought the 2004 agreement was "invalid" because "[i]t's a bad business decision." Docket No. 55 (Pl.'s Mot. to Amend) at 5-6. Inexplicably, counsel for plaintiff did not include the cited portion of the deposition transcript in his declaration accompanying the moving paper; therefore, this purported testimony has not been considered by the court. The court likewise declines to consider the mostly illegible photocopy filed as Exhibit 13 to the Levy declaration, Docket No. 61-1. The court does note that the legible parts of the email demonstrate the author was expressing concerns about an agreement violating the antitrust laws, rather than providing any sort of authorization to proceed.

3. Defendant alleged in its answer that the provision granting a "promotional allowance" also violates section 17045 of the California Business and Professions Code; however, on this motion defendant only challenges the contract on the basis of the alleged illegality of the MDA provision. Furthermore, defendant moves for summary judgment pursuant to the California Unfair Practices Act but not the federal Robinson-Patman Act, conceding that "the existence of issues of material fact relevant to the requirements of the Robinson-Patman Act might preclude a motion for summary judgment." Docket No. 54 (Def.'s MSJ) at 3 n.2.

4. If defendant noticed that plaintiff's expert Novotny has been a director of plaintiff, *see* Novotny Dec., Exh. 1 at 3 (curriculum vitae), defendant did not mention the fact in its papers.

5. The primary policy rationale for both section 17045 and the Robinson-Patman Act was the exposure in the 1930s of the widespread practice whereby large chain retailers, particularly grocery store chains, leveraged their purchasing power to extract secret discounts from wholesalers, allowing the chains to underprice independent retailers and drive them from the field. *See generally ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.*, 14 Cal. 4th 1247, 1256-61 (1997) (explicating statutory purposes and historical background of section 17045).

6. There is evidence on the record that plaintiff received discounts, rebates or allowances in connection with other lines of pet food.

7. Defendant spends some energy attempting to show that, if the MDA payments are "discounts" under section 17045, plaintiff has not done anything to earn the discounts. Yet the 2004 agreement sets out a list of specific obligations for plaintiff and provides that defendant may terminate the agreement on thirty days written notice should plaintiff not meet its obligations. The fact that defendant has not done so, but has instead hung its hat on an illegality defense, leads to an inference that plaintiff has met its obligations. That defendant may no longer be pleased with the substance of the contract it negotiated does not, of course, lead to a conclusion that the contract is illegal.

8. Plaintiff also states in its reply brief, "[defendant] has not established what state law applies to this diversity case since [defendant] signed the subject contract in Missouri." Yet plaintiff does not actually provide any authority or argument that Missouri law should apply. "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." Fed. R. Civ. P. 44.1. To determine whether a party has given reasonable notice of its intent to invoke foreign law, a court should: (1) consider the stage which the case has reached at the time of notice; (2) evaluate the reason proffered by the party for the failure to give earlier notice; and (3) consider the importance to the case as a whole of the issue of foreign law. *See APL Co. Pte. Ltd. v. UK Aerosols Ltd.*, 582 F.3d 947, 955-56 (9th Cir. 2009). "Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum." *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1184 (9th Cir. 2009) (quoting *Interpool Ltd. v.*

*Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1458 (9th Cir. 1989)). Plaintiff has never before raised a choice of law issue and, indeed, did not even raise this issue here, having provided no authority for the proposition that Missouri law might apply in the instant case. Plaintiff has therefore acquiesced in the application of California law.