United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PET FOOD EXPRESS LIMITED, a California Corporation,

        Plaintiff,

  v.

ROYAL CANIN USA, INC., a Delaware Corporation,

        Defendant.
                                      /

No. CV 09-01483 MHP

**MEMORANDUM & ORDER**

**Re: Plaintiff's Motion for Summary Judgment; Defendant's Motion for Partial Summary Judgment.**

      Pet Food Express Ltd. brought this diversity action against Royal Canin USA, Inc. alleging breach of contract. Defendant asserted various affirmative defenses including illegality and counterclaimed for a declaratory judgment of the same and for rescission and restitution. Now before the court is plaintiff's motion for summary judgment as to defendant's affirmative defenses based on illegality and all counterclaims, defendant's motion for summary judgment as to plaintiff's alleged damages and defendant's motion in limine to bar plaintiff's expert testimony. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

      The facts, which the court now restates below, were previously recounted by the court in its Order Denying Defendant's Motion for Summary Judgment. Docket No. 70 (Order).

I.      The Parties

At all relevant times, plaintiff has been a corporation organized under the laws of, and having its principal place of business in, California, and defendant has been a Delaware corporation having its principal place of business in Missouri. Plaintiff is a retail chain that sells premium pet food; it started at a single location in San Francisco and now has thirty-five stores in the greater Bay Area. Unlike its local chain competitors, plaintiff invests heavily in employee education and training and customer education. Defendant is a manufacturer and distributor of premium pet food and pet care products.

II.     The Contractual Relationship

The parties entered into their first agreement in 1997 ("the 1997 agreement").[1] In October 2003, plaintiff filed a breach of contract suit against defendant in Alameda County Superior Court, alleging defendant violated the terms of the 1997 agreement. Specifically, plaintiff alleged defendant had begun selling its product lines in stores belonging to Pet Food Express's competitors Petsmart and Petco in Pet Food Express's exclusive territory, in violation of the agreement.

In February 2004, the parties signed an "Amended and Restated Retailer Purchase Agreement" ("the 2004 agreement"), which became effective following plaintiff's request for dismissal with prejudice of the lawsuit in Alameda County. By the 2004 agreement defendant appointed plaintiff as a "market developer," through December 31, 2017, for certain of defendant's products within a specified territory. Plaintiff assumed eight enumerated obligations, which included: placing defendant's products in a "prime selling location" at each of its outlets; sending its employees to periodic sales meetings and seminars hosted by defendant; establishing sales promotion programs to increase consumer awareness of defendant's products; and remaining current in its payment obligations to defendant. In return, defendant obligated itself to, among other things, pay plaintiff a one-time volume rebate, a promotional allowance ("PA") and a market development allowance ("MDA"). The MDA provision reads in its entirety:

> So long as [Pet Food Express] is in compliance with its duties and obligations, [Royal Canin] shall pay [Pet Food Express] an annual market development allowance funded by [Royal Canin] each year in the amount of five percent (5%) of the aggregate annual dollar volume of Products shipped by [Royal Canin] into the Territory directly

2

and of Products shipped by [Royal Canin] to distribution facilities outside the Territory where such Products are sold at retail within the Territory, based upon [Royal Canin's] wholesale price for the Products. The Territory shall include any new county or counties in which [Pet Food Express] opens an Outlet before the end of the applicable calendar year, so long as such Outlet is comprised of at least 2,000 square feet and is intended to operate as a permanent, as opposed to temporary or seasonal, location. Such allowance, if any, shall be payable on or before March 15 of each year and shall be accompanied by a written statement from [Royal Canin] setting forth the calculations used in making such payment.

The PA provision reads in its entirety:

> In consideration for PFE's undertakings, starting with PFE's purchases of RCUSA's products in 2004, RCUSA shall grant PFE a promotional allowance of Fifteen Percent (15%) of the net invoice amount of each invoice, as a deduction against each invoice.

The 2004 agreement also provides that defendant could terminate that agreement under certain circumstances, such as plaintiff's failure to perform its duties and obligations, plaintiff's failure to increase its purchases of defendant's products year-over-year, or a change in plaintiff's ownership that adversely affected defendant's business within the defined territory. The 2004 agreement "expressly supersede[d] and replace[d]" the 1997 agreement "in all respects." It also contains a confidentiality clause which reads in its entirety:

> [Pet Food Express] acknowledges and agrees that all data in this agreement constitute [Royal Canin's] "Confidential Information". As an inducement to [Royal Canin] to enter into and perform its obligations under this Agreement, [Pet Food Express] agrees to keep all of the Confidential Information in the strictest confidence and shall not use or disclose to third parties any of the Confidential Information, except as expressly authorized in the course of performing its duties hereunder.

III.     Performance of the 2004 Agreement

Pursuant to the provisions of the 2004 agreement, defendant tendered annual MDA allowances to plaintiff. On March 16, 2009, plaintiff's president, Michael Levy, contacted defendant to inform it that it was in breach of the agreement because the annual MDA check for 2008 had not been paid by the March 15 deadline. After the parties exchanged several telephone and email messages, defendant's general manager, Joe Flanigan, arrived at Levy's office unannounced on or about March 25, 2009. Flanigan expressly repudiated the 2004 agreement, stating that he would not tender the MDA check, which had a payment amount between $310,000

3

and $320,000, unless plaintiff signed a new agreement that Flanigan had brought with him. Defendant's proposed new agreement would shorten the term of the arrangement, remove the exclusivity, and eliminate the MDA provision. Levy refused to sign the proposed new agreement, and defendant continued to withhold the 2008 MDA payment.

Defendant alleges it refused to pay the MDA because it determined that the promotional allowances and MDA payments it had been making to Pet Food Express since 2004 were illegal and unenforceable under section 2(d) of the federal Robinson-Patman Act, 15 U.S.C. § 13(d), and the parallel provision of California's Unfair Practices Act (UPA), codified at California Business and Professions Code section 17045 ("section 17045").

According to Flanigan, since the time of execution of the 2004 agreement, none of defendant's other customers in the United States received "a benefit comparable to the MDA." Flanigan also avers that "[u]nder no circumstances is any other [Royal Canin] customer entitled to rebates, refunds, commissions, or discounts based on sales made by its competitors" and "no customer has ever been informed of the benefits granted by the 2004 Agreement to [Pet Food Express]."[2] Defendant admits it commonly used a standard-form agreement containing an MDA provision between 1997 and 2002 as an incentive for retailers to provide market entry for its new line.

IV.   Procedural History

On March 26, 2009, plaintiff filed suit against defendant in the Superior Court for Alameda County for breach and repudiation of the 2004 agreement. On April 6, 2009, plaintiff filed a substantially similar action in this court. Defendant removed the state action to federal court, and the two actions were related and consolidated pursuant to 28 U.S.C. section 1332. Defendant answered and counterclaimed on May 21, 2009. Plaintiff answered defendant's counterclaim on June 12, 2009. On July 28, 2009, the court denied plaintiff's motion for writ of attachment. Defendant filed its motion for summary judgement on November 23, 2009, and plaintiff filed its motion to amend on November 30, 2009. On February 16, 2010, the court denied defendant's motion for summary judgment and plaintiff's motion to amend. Defendant sought to

4

## LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986). A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make credibility determinations. *Id.* at 255. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 250.

## DISCUSSION

I.  Plaintiff's Motion

Plaintiff moves for summary judgment as to defendant's illegality-based affirmative defense under federal and state antitrust law and all counterclaims.

   A.  Illegality

Defendant raises an illegality-based affirmative defense as well as an illegality-based counterclaim alleging that certain terms of the MDA and PA terms of contract violate sections 2(a), (d) and (f) of the Robinson-Patman Act, codified at 15 U.S.C. §§ 13(a), (d) and (f) respectively and section 17045 and various other provisions of the state Unfair Practices Act ("UPA").

      1.  Standing

Defendant's antitrust-based defense and counterclaim raise standing concerns. Defendant raises the issue of competitive harm on behalf of plaintiff's competitors rather than doing so on its

own behalf. Indeed, after duly negotiating the 2004 agreement with plaintiff and performing under that agreement for at least four years, defendant now asks the court to nullify defendant's *own* arrangement with plaintiff on the grounds that the arrangement violates antitrust law to the detriment of plaintiff's competitors, rather than asserting some theory of competitive harm that reflects injury to defendant. This raises standing issues which neither party addresses and which the court now considers *sua sponte*.

> Standing is an essential and unchanging part of the case-or-controversy requirement of Article III. At an irreducible constitutional minimum, standing requires the party asserting the existence of federal court jurisdiction to establish three elements: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury. In addition to these requirements, the doctrine of prudential standing requires us to consider, among other things, whether the alleged injury is more than a mere generalized grievance, whether the plaintiff is asserting her own rights or the rights of third parties, and whether the claim falls within the zone of interests to be protected or regulated by the constitutional guarantee in question. *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (internal citations, quotation marks and alterations omitted).

Although couched in vague terms of some alleged harm to competition, defendant's true injury here is its continued obligation to perform under a contract whose terms are now objectionable to defendant. Support for this conclusion is found in the fact that defendant performed under the terms of this contract for at least four years without raising any concern that the MDA and PA were illegal under state and federal antitrust laws. Moreover, defendant only raised these issues as an affirmative defense and counterclaim after its own alleged breach of the contract. Suddenly, defendant's good-Samaritan instincts have prompted these claims that, in reality, describe a competitive injury to plaintiff's competitors and which elucidate no similar injury to defendant or to competition. Thus, the nature of defendant's claims of injury are *not* rooted in an antitrust law-based injury-in-fact, but instead, if anything, present a harm grounded solely in contract law.

Defendant's singular reliance on the alleged price differential encompassed in the MDA and PA is also indicative that any alleged antitrust injury here would be to plaintiff's secondary line competitors and not to defendant, who is a primary line seller. Citing *Hasbrouck v. Texaco*, 842 F.2d 1034 (9th Cir. 1987), defendant contends that evidence of the alleged price discrimination

6

between plaintiff and its competitors is all that is required here to provide the requisite showing of a possibility of harm to competition under section 2(a) of the Robinson-Patman Act. However, the facts of *Hasbrouck* are readily distinguishable from those here and, if anything, serve to implicate defendant's lack of standing to raise its antitrust counterclaim and affirmative defense.

      The plaintiffs in *Hasbrouck* were secondary line entities alleging competitive injury at that level. The plaintiffs were oil retailers who paid a higher price for oil than various wholesalers who were immediately passing their discounts on to favored retailers who were in competition with plaintiffs. Thus, the plaintiffs in *Hasbrouck* were able to show that there was a substantial price difference between themselves and their competitors, and the court stated that this difference alone over a period of time was sufficient to establish the requisite possibility of harm to competition. *Id.* at 1041; *see also, Volvo Trucks North America, Inc. v Reeder-Simcoe GMC, Inc.*, 546 U.S. 164, 177 (2006) ("[A] permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time."); *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434-35 (1983). The Supreme Court has held, however, that where the plaintiff is not a competitor alleging harm, the mere existence of a price differential is not enough to support an inference of competitive harm. *See Volvo Trucks*, 546 U.S. at 177.

      Unlike the plaintiffs in *Hasbrouck*, defendant/counter-plaintiff here is not a secondary line competitor, but rather a primary line supplier alleging secondary line competitive harm. Thus, the fact that plaintiff's competitors may have had to pay more for defendant's product[3] says nothing as a matter of course about any competitive harm to defendant. Accordingly, as a matter of antitrust law, defendant's affirmative defense and counterclaim appear to assert no injury-in-fact specific to defendant.

      Moreover, defendant's affirmative defense and counterclaim similarly fail as a matter of prudential standing. "[P]rudential standing concerns require that we consider, for example, whether the alleged injury is more than a mere generalized grievance, whether [plaintiffs] are asserting [their] own rights or the rights of third parties, and whether the claim falls within the zone of interests to be

7

protected or regulated by the constitutional guarantee in question." *Alaska Right to Life Political Action Comm.*, 504 F.3d 840, 848-49 (9th Cir. 2007) (internal quotation marks and citation omitted). As discussed above, defendant appears to attempt to vindicate the rights of third parties, namely plaintiff's competitors, Petco and Petsmart, rather than assert its own antitrust injuries. In this light, there are more appropriate parties who should bring these claims. Indeed, to permit defendant to litigate what is essentially its contract grievance on the basis of antitrust law is "inconsistent with the purposes implicit in the [antitrust laws and it] cannot reasonably be assumed that Congress intended to permit the suit." *Ocean Advocates v. U.S. Army Corps of Eng's*, 402 F.3d 846, 861 (9th Cir. 2005) (quoting *Clarke v. Securities industry Ass'n*, 479 U.S. 388, 399 (1987) (finding that plaintiff had prudential standing where plaintiff's injuries fell "within the zone of interests protected by [the Congressional legislation at issue.]")

Even if defendant has standing to raise these claims, defendant fails to proffer evidence to overcome plaintiff's motion for summary judgment, as a matter of both state and federal law. Defendant raises an affirmative defense of illegality and a counterclaim of illegality under state law, arguing that the contract runs afoul of Bus. & Prof. Code section 17045 of the Unfair Practices Act ("UPA"). According to the defendant, two provisions of the contract render it illegal. Specifically, the MDA and the PA clauses amount to illegal, secret and unearned discounts. *See* Docket No. 95 (JSUF) at 18.

Bus. & Prof. Code section 17045 states:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

This statutory language may be read to contain four discrete elements: (1) a payment of the type described in the statute (2) which is secret (3) and injures a competitor (4) and tends to destroy competition. *See, e.g.*, *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 212 (1993). An arrangement is not rendered unlawful by section 17045 *unless each of these elements is met.*

8

The court has previously addressed defendant's affirmative defense that the MDA clause of the 2004 contract renders it illegal under section 17045. In previously denying defendant's motion for summary judgment, the court pointed out that defendant had failed to proffer evidence from which the trier of fact could rule in its favor. Specifically, the court concluded that defendant failed to adduce evidence that the MDA term was secret, failed to adduce evidence of injury to either its own competitors or to PFE's competitors or evidence of a tendency to destroy competition. *See* Order. In addition, the court stated that, "defendant's theory of competitive injury is so underdeveloped as to leave the court with no clear picture of the potential harm perceived by defendant." *Id.* at 7. In opposing plaintiff's present motion here, defendant has fatally failed to remedy these deficiencies.

For example, with respect to the injury-to-a-competitor element, defendant makes a specious argument that it need not proffer evidence of such harm because section 17045 creates a presumption of harm that plaintiff must rebut. Defendant cites the recently decided *Bay Guardian Co. v. New Times Media LLC*, 187 Cal.App.4th 438 (2010) for the proposition that "the [Unfair Practices Act] does not require proof that injury has already occurred before relief may be granted," docket no. 96 (Defendant's Opp.) at 7, and concludes that plaintiff bears the burdens of persuasion and production of evidence as to the *lack* of harm to a competitor. In other words, defendant asks the court to place the burden of persuasion on plaintiff as to defendant's illegality-based affirmative defenses and defendant's illegality-based counterclaims. This argument, however, inaccurately casts the parties' burdens of persuasion and production in a motion for summary judgment.

First, defendant's reliance on *Bay Guardian* is misplaced. In *Bay Guardian*, the California Court of Appeals considered whether the recoupment of losses through subsequent monopoly pricing is an essential element in a violation of section 17043 of the UPA. Section 17043 prohibits "below-cost sales undertaken for the purpose of injuring competitors or destroying competition, that has resulted in a competitive injury." *Id.* at 455. The court held that subsequent recoupment of losses through monopoly pricing was not an essential element of a section 17043 violation because "the very gravamen of the offense is the purpose underlying the anticompetitive act, rather than the

9

1 actual or threatened harm to competition." *Id.* at 456.  Thus, section 17043 focuses on the intent to
2 harm,[4] which according to section 17071 may be presumed from "proof of one or more acts of
3 selling or giving away any article or product below cost or at discriminatory prices, *together with*
4 proof of the injurious effect of such acts." Cal. Bus. & Prof. Code § 17071 (emphasis added).[5]

5       Here, defendant's affirmative defense and its counterclaims are grounded in illegality
6 pursuant to section 17045, which as stated above requires the party raising the claim to show all four
7 of the elements previously enumerated by this court. *Bay Guardian* does nothing to change this
8 reality, and in fact clarifies that while section 17043 is concerned with "the purpose" of the
9 violation, section 17045 is concerned with "the ultimate effect of the violation." *Bay Guardian*, 187
10 Cal.App.4th at 458.[6]  This suggests that section 17045 is necessarily concerned with outcomes as
11 opposed to a section 17043 violation which is concerned with possibilities.  Accordingly,
12 defendant's argument that there is a presumption of harm to competitors merely from the invocation
13 of a section 17045 violation that in turn relieves defendant of the burden of persuasion as to its
14 affirmative defense and its counterclaims grounded in this section is unavailing.  Indeed, although
15 plaintiff is the moving party here as to defendant's affirmative defenses and defendant's
16 counterclaims, plaintiff does not bear the ultimate burden of persuasion at trial as to those issues.
17 That burden rests with the defendant who raises the affirmative defenses and the counterclaim.  To
18 be sure, as the moving party for summary judgment plaintiff must "either produce evidence negating
19 an essential element of the [defendant's counter]claim or defense or show that the [defendant] does
20 not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."
21 *Nissan Fire & Marine Ins. Co., Ltd. v Fritz*, 210 F.3d 1099, 1102 (9th Cir. 2000).  However, plaintiff
22 has satisfied this burden by pointing out that defendant has failed to point to evidence in the record
23 that would permit defendant to meet its burden of persuasion as to its affirmative defense and
24 counterclaims at trial.  This is all that plaintiff must do and the burden falls on defendant to produce
25 evidence to establish its affirmative defenses and counterclaims.

26       Nonetheless, in opposition defendant relies on the fallacy that plaintiff, as the moving party,
27 bears the burden of producing evidence to disprove the elements of section 17045.  In so doing,

28

10

defendant fails to proffer its own evidence to support a prima facie section 17045 violation.[7] Without citing to any cases, defendant states in a conclusory fashion that, "under the ordinary standards set forth in § 17045, the [c]ourt and jury may take account of the magnitude of the margin difference created by the MDA and PA to infer that, however these unearned benefits were being invested in [plaintiff's] business, they necessarily gave [plaintiff] an unfair advantage vis-a-vis the petfood retailers with which it is in competition." Defendant's Opp at 18:3-6.  The court finds no authority for this contention.  What the court does conclude, as it did previously in rejecting defendant's motion for summary judgment on this issue, is that actual evidence which supports an inference of competitive harm is required. *See, e.g., Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal.App.4th 309 (2004); *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal.App.4th 202. 213 (1993).  Unlike in *Fisherman's Wharf Bay Cruise Corp.* and *Diesel*, defendant proffers neither evidence of harm to a competitor nor harm to competition.

Defendant's reliance on the PA as an illegal contract term pursuant to section 17045 fares no better.  As with the MDA, defendant fails to proffer evidence of harm to a competitor which is necessary to establish a prima facie violation of section 17045.  Because defendant fails to identify a genuine issue of material fact at to this element and needing to show all four of the elements associated with a section 17045 claim, defendant cannot survive summary judgment as to this issue. Accordingly, summary judgment as to defendant's affirmative defense and counterclaim grounded in section 17045 is GRANTED in favor of plaintiff.

Defendant also alleges that plaintiff has violated sections 17051, 17041 and 17200 of the Cal. Bus. & Prof. Code.  Section 17051 states: "Any contract, express or implied, made by any person, firm, or corporation in violation of this chapter is an illegal contract and no recovery thereon shall be had."  Because there is no genuine issue of material fact that the contract was made in violation of state law, defendant's section 17051 claim may not stand.  With respect to sections 17047 and 17200, defendant, in its opposition, does not dispute plaintiff's contention that there is no genuine issue of material fact as to these claims.

United States District Court
For the Northern District of California

1    Defendant also fails to proffer evidence as to its federal Robinson-Patman Act claims
2 sufficient to survive summary judgment. "Section 2(a) of the Clayton Act ([as amended by] the
3 Robinson-Patman Act) prohibits the sale of like goods to different purchasers at a different price,
4 where the effect of such price discrimination may be substantially to lessen competition."
5 *Hasbrouck*, 842 F.2d at 1038. "To establish a prima facie violation of § 2(a), one of the elements a
6 plaintiff must show is a reasonable possibility that a price difference may harm competition." *Falls*
7 *City*, 460 U.S. at 434-35.
8    For the purposes of federal law, defendant/counter-plaintiff is a primary line entity and as to
9 primary line plaintiffs, the mere existence of a price differential is simply not enough to establish a
10 genuine issue of material fact. Indeed, a stricter standard applies in cases where the plaintiff is a
11 primary line supplier alleging the possibility of competitive harm at that level. *See Chroma Lighting*
12 *v. GTE Products Corp.*, 111 F.3d 653, 658 (9th Cir. 1997) ("We decline to extend the reasoning of
13 *Brooke Group* to secondary-line cases because of the significant differences between primary- and
14 secondary-line claims. First and foremost, Congress' concern for the fate of individual competitors,
15 as expressed in the legislative history of the Robinson-Patman Act, focused on secondary-line, not
16 primary-line competition.")
17    In primary line cases, "a plaintiff seeking to establish competitive injury resulting from a
18 rival's low prices must prove that the prices complained of are below an appropriate measure of its
19 rival's costs." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993).
20 Thus, in *Brooke Group*, the Supreme Court required that more than a price differential alone was
21 required to substantiate an antitrust claim brought by a primary line plaintiff. To be sure, defendant
22 has identified *not one* primary line rival here, perhaps because defendant itself is the malfeasant
23 having negotiated the terms of the contract presumably to the detriment of its own primary line
24 competitors. Indeed, defendant is complicit in the alleged antitrust violations, and concedes that at
25 least the MDA term was a staple of its previous contracts with other secondary line retailers. Docket
26 No. 87-3 (Flanigan Dec.) ¶ 4.[8] Thus, it is entirely unclear how defendant would even begin to allege
27 a primary line violation without implicating itself and opening itself up to the risk of liability.
28

12

Defendant similarly fails to proffer evidence as to its section 2(d) and section 2(f) claims. Section 2(d) states:

> It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities,

and section 2(f) states: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." With respect to section 2(d), defendant offers no evidence of its other contracts, a means of showing that plaintiff's terms were proportionally unequal. With respect to section 2(f), "the Supreme Court held that a buyer does not violate section 2(f) in receiving a discrimination in price unless the discrimination is unlawful under section 2(a)." *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 882 (9th Cir. 1982) (citing *Great Atlantic & Pacific Tea Co., Inc. v. F.T.C.*, 440 U.S. 69 (1979). Given the court's conclusions above, defendant's claim fails. Moreover, as previously stated, it is entirely unclear how defendant would even begin to allege these claims without implicating its own culpability.

Lastly, plaintiff moves for summary judgment as to defendant's third counterclaim of rescission and restitution. "Rescission for illegality. . . is a remedy which enables a party, in the circumstances specified, to procure restitutionary relief with respect to a contract which was never enforceable." *People v. Beaumont Inv., Ltd.*, 111 Cal.App.4th 102, 133 (2003). Given the court's conclusions above, defendant/counter-plaintiff has failed to establish a genuine issue of material fact as to the illegality of the 2004 agreement.

Accordingly, summary judgment as to defendant's antitrust based defenses and as to all counterclaims is GRANTED in favor of plaintiff.

II.     Defendant's Motion

Defendant moves for summary judgment on two grounds. First, defendant argues that by filing the instant action on March 26, 2009, plaintiff repudiated the 2004 agreement thereby

releasing defendant from performance after that date. Second, defendant argues that plaintiff is unable to establish damages beyond 2009 and therefore is not entitled to any damages award that includes such damages.

"California law recognizes that a contract may be breached . . .by repudiation." *Central Valley General Hosp. v. Smith*, 162 Cal.App.4th 501, 514 (2008). "[R]epudiation of a contract may be express or implied." *Taylor v. Johnston*, 15 Cal.3d 130, 137 (1975). *Id.* Defendant concedes that in the days prior to plaintiff's filing of this action, its CEO, Joe Flanigan, refused to tender the 2008 MDA payment of approximately $310,000 to plaintiff ostensibly because defendant sought to renegotiate the terms of the 2004 agreement. Flanigan Dec. ¶¶ 3, 11-12; Docket No. 95 (Joint Statement of Undisputed Facts) ¶ 11. Indeed, defendant does not dispute that Flanigan refused to tender the MDA per the terms of the contract, but argues that this failure did not represent a material breach of the contract terms. Thus, according to defendant, plaintiff misconstrued this overt act as constituting a repudiation, subsequently itself repudiated the contract by filing its breach of contract claim and breached the confidentiality term of the contract by appending a copy of the 2004 agreement to its complaint.

State law is clear that "express repudiation is a clear, positive, unequivocal refusal to perform." *Taylor*, 15 Cal.3d at 137. Defendant concedes that it refused to tender the 2008 MDA payment to plaintiff and there is no genuine issue of material fact that this refusal constituted a "a clear, positive, unequivocal refusal to perform." *Martinez v. Scott Specialty Gases, Inc.*, 83 Cal.App.4th 1236, 1246 (2000). Accordingly, it was well within plaintiff's right to "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties." *Taylor*, 15 Cal.3d at 137. Thus, the contract was breached by defendant's express refusal to tender the 2008 MDA payment and there is no genuine issue of material fact that plaintiff was entitled to terminate the contractual agreement and seek damages. Accordingly, defendant's motion as to this claim is DENIED.

14

With respect to damages, the court concludes that there is genuine issue of material fact as to the correct measure and amount of damages due to plaintiff as a result of defendant's breach. Accordingly, summary judgment is DENIED.

III     Defendant's Motion in Limine

Defendant moves to bar plaintiff's introduction of expert testimony from three sources: Donald A. Glenn, C.P.A., purporting to offer testimony as to plaintiff's future lost profits, Heather R. Govea and James V. Heim.

As a primary matter, the court notes that there are issues remaining for trial that must be resolved in plaintiff's favor prior to the consideration of plaintiff's damages.[9] Two of defendant's affirmative defenses, equitable estoppel and unclean hands have yet to be resolved.[10] If the trier of fact finds in favor of plaintiff with respect to these affirmative defenses, as stated above, there are issues of fact outstanding as to the correct measure and amount of damages due to plaintiff as a result of defendant's breach.

There are several unresolved issues regarding the calculation of plaintiff's lost profits. Firstly, there is an issue as to whether plaintiff's stores that do not currently exist should factor into lost profits. Plaintiff contends that it plans to open stores in Sacramento, Placer, San Diego, Los Angeles, Orange, and New York County in 2011-2012. These stores represent approximately $13 million of plaintiff's expert witness Glenn's $23 million lost profit calculation. Docket No. 86 (Motion In Limine) at 4. Defendant points out that plaintiff currently does not have stores at any of these locations, and contends that it has not presented evidence to support the proposition that it will open stores in these locations. Motion at 4-5. Alleging that there is no evidence that these stores would have ever been profitable, defendant argues that lost profits arising from these unestablished locations are too "speculative to meet the legal standard of reasonable certainty." Motion at 10-12 (internal citations omitted).

In addition, plaintiff's expert Glenn, broadly assuming that these unestablished locations would have similar average dollar sales of defendant's products as stores in the Bay Area, projected a growth rate for these stores equivalent to that of the Bay Area and made no allowance for

15

1 differences in consumer spending levels in the poorer areas of Los Angeles and San Diego County
2 as compared to upscale San Francisco neighborhoods. Motion at 11.[11]

3       Plaintiff counters by stating that it has already signed leases for future Sacramento and Placer
4 County locations and plans to open a Southern California store in 2012. Opposition at 4-5; Witriol
5 Dec. 7. Plaintiff further claims that it has been presented with a master lease on a space in New
6 York County, and is currently negotiating a sublease for this space. Finally, plaintiff points out that
7 it is in sound financial condition and can self-finance new stores without borrowing money. Witriol
8 Dec. 2.

9       Secondly, there is an issue as to whether the projected growth rate for unestablished locations
10 should be based on Glenn's predicted 2009 sales growth or actual 2009 sales growth. Though actual
11 2009 sales figures are available, Glenn projected sales growth rates of 27% in 2008-2009, gradually
12 declining to 11% by 2016-2017. This plainly ignores fact that sales actually declined 16% from
13 2008 to 2009 and assumes that the premium food market would continue to expand regardless of the
14 state of the economy. Motion at 5.

15       Thirdly, there is an issue as to whether the speculative nature of lost profits in the later years
16 of the 2004 agreement should be used to mitigate lost profits. Failure to reduce damages due to
17 uncertainty of lost profits towards the end of the 2004 agreement ignores the contingency in the
18 agreement that would have allowed defendant to terminate the agreement prior to 2017.
19 Specifically, plaintiff's failure to perform its contractual duties and obligations by refraining from
20 purchasing more of defendant's products year over year would have justified defendant in declaring
21 the arrangement terminated. Defendant notes that plaintiff's business may have declined, that
22 plaintiff may have found another manufacturer's products to be better or that plaintiff may have been
23 unable to withstand industry competition. For example, Pet Club now carries defendant's products
24 and this increased competition may have left plaintiff unable to increase defendant's product
25 purchases year over year. Plaintiff counters by asserting that it easily satisfied its contractual
26 obligations before defendant's repudiation and contends that it is reasonable to assume plaintiff
27 would have continued to satisfy its obligations for the duration of the agreement.

16

Given the highly speculative nature of plaintiff's expert testimony, defendant's motion in limine is GRANTED in favor of defendant. At trial, plaintiff will have to proffer evidence from which the trier of fact could reasonably determine the correct measure and amount of damages due to plaintiff as a result of defendant's breach.

CONCLUSION

Plaintiff's motion for summary judgment is GRANTED in its entirety. Defendant's motion for summary judgment is DENIED, and defendant's motion in limine is GRANTED.

IT IS SO ORDERED.

Dated: 4/18/2011

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

**ENDNOTES**

1. Pet Food Express entered into the 1997 agreement with Pet Products Plus. The parties agree that Royal Canin is the successor-in-interest to Pet Products Plus.

2. Plaintiff's papers quoted at length alleged deposition testimony wherein Flanigan admitted he thought the 2004 agreement was "invalid" because "[i]t's a bad business decision." Docket No. 55 (Pl.'s Mot. to Amend) at 5-6. Inexplicably, counsel for plaintiff did not include the cited portion of the deposition transcript in his declaration accompanying the moving paper; therefore, this purported testimony has not been considered by the court. The court likewise declines to consider the mostly illegible photocopy filed as Exhibit 13 to the Levy declaration, Docket No. 61-1. The court does note that the legible parts of the email demonstrate the author was expressing concerns about an agreement violating the antitrust laws, rather than providing any sort of authorization to proceed.

3. The court notes that defendant has not adduced evidence showing that plaintiff's competitors paid more for defendant's products than did plaintiff.

4. "[T]he intent or purpose of the below-cost sale is at the heart of the statute." *Id.*

5. "In all actions brought under this chapter proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition." Cal. Bus. & Prof. Code § 17071.

6. "Additional features of the statutory construct of the UPA further persuade us that implication of recoupment ability as a requirement in section 17043 is neither necessary nor intended. Within other unfair trade provisions of the UPA that prohibit loss leaders (§§ 17030, 17044) and secret discriminatory rebates or allowances (§ 17045), the Legislature has seen fit in the language of the statutes to refer to potential injury to a competitor or the competitive structure, while statutes that prohibit locality price discrimination (§§ 17040-17042), like section 17043, are directed at the intent of the violation. The Legislature has thus evinced the ability in the UPA to target either the purpose or ultimate effect of the violation, and clearly intended the former in the language of section 17043." *Id.*

7. After all, at trial defendant bears the burden of persuasion as to its affirmative defenses and as to its counterclaim.

8. "I was well aware that in the 1990s, when RC USA was introducing a new line of products in the United States market, it had appointed numerous 'market developers' around the country. These were retailers who were provided incentives to promote the sale of our products. But I also knew that all of those arrangements, except one, expired by the end of 2002."

9. Plaintiff did not move for summary judgment as to all of defendant's affirmative defenses, only as to defendant's illegality-based defenses.

10. Defendant's first affirmative defense, failure to state a claim, fails as a matter of law. As previously stated, there is no genuine issue fo material fact that defendant breached the contract by failing to pay the MDA. Similarly, defendant's third affirmative defense fails as a matter of state law. Upon defendant's breach, plaintiff was entitled to "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties." *Taylor*, 15 Cal.3d at 137.

11. Defendant also objects to plaintiff basing its estimation of likely unestablished location sales on the number of pet food stores in each respective County in 2006. Motion at 5.