**United States District Court**
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8   PET FOOD EXPRESS LIMITED,                    No. C-09-1483 EMC

9              Plaintiff,                        **ORDER DENYING DEFENDANT'S
                                                 MOTION FOR JUDGMENT AS A**
10         v.                                    **MATTER OF LAW, OR IN THE
                                                 ALTERNATIVE, TO ALTER**
11  ROYAL CANIN USA, INC.,                       **JUDGMENT**

12             Defendant.                        **(Docket No. 170)**
    _____/

13

14

15         Pending before the Court is Defendant Royal Canin's post-trial motion judgment as a matter

16  of law, or in the alternative, an amended judgment awarding only $945,157.  Docket No. 170.

17  Following a three-day trial, the jury reached a verdict awarding $3,649,124 in damages to Pet Food

18  Express.  *See* Jury Verdict, Docket No. 157.  After considering the parties' submissions and oral

19  argument, and for the reasons set forth below, the Court hereby **DENIES** the motion.

20              **I.    FACTUAL & PROCEDURAL BACKGROUND**

21         Royal Canin ("RC"), a manufacturer of premium petfood, and Pet Food Express ("PFE"), a

22  retail store headquartered in Oakland, California, entered into a retail sales contract in 2004 under

23  which PFE was entitled to certain benefits, including an off-invoice discount ("promotional

24  allowance," or "PA") and a market development allowance ("MDA"), so long as it continued to

25  perform certain stated obligations.  The most important of these obligations, for purposes of this

26  dispute, was that PFE was required to increase its purchases of RC products by at least $1 each year

27  in order to remain eligible for either the PA or the MDA payments.  The contract was scheduled to

28

United States District Court

For the Northern District of California

1  expire at the end of 2017.  In 2009, RC USA failed to tender its MDA payment under the contract,

2  and PFE considered that failure a repudiation of the contract.  It filed suit the next day.

3      The Court ruled on summary judgment motions that RC's failure to make the MDA payment

4  in 2009 constituted breach.  *See* Docket No. 110.  The sole issue remaining for trial was thus

5  whether, and to what extent, PFE was entitled to damages for RC's breach.  PFE claimed that it was

6  entitled to damages both for the lost MDA (5% of RC's annual aggregate dollar volume of product

7  shipped into the Territory)[1] and for the lost PA (15% discount on PFE's purchases of RC products) it

8  would have received, but for RC's breach, from the date of breach in 2009 until the contract's

9  expiration in 2017.  RC argued that PFE was entitled to only the MDA for 2008 and 2009, and the

10  PA for part of 2009 (pro-rated from the date of breach).

11      At trial, Plaintiff primarily offered the testimony of PFE's co-CEOs, Michael Levy and Mark

12  Witriol, regarding PFE's business dealings with RC, its past success promoting RC products in the

13  Bay Area, and its projected future losses due to RC's breach.  Upon the close of Plaintiff's case-in-

14  chief, Defendant RC moved for judgment as a matter of law pursuant to Rule 50(a).  Defendant

15  argued that there was insufficient evidence from which the jury could determine (1) future MDA

16  payments from the Expansion Counties (counties in which PFE did not currently have a store but

17  allegedly planned to open one in the near future); (2) MDA damages more generally, particularly in

18  the future; and (3) PA damages, particularly in the future.  The Court took the motion under

19  submission and allowed the case to continue through RC's presentation of evidence.    RT 389:16-

20  22.  PFE subsequently dropped its damages claim based on MDA in the Expansion Counties.  At the

21  close of evidence, the Court submitted the case to the jury, which returned a verdict in favor of PFE

22  in the amount of $3,649,124, consisting of $2,637,651 in PA damages and $1,011,473 in MDA

23  damages.

## II.   DISCUSSION

25      Defendant RC renews its motion for judgment as a matter of law ("JMOL") and, in the

26  alternative, asks for an amended or altered judgment.  Docket No. 170 ("Mot.").  RC contends that

27  _____

28      [1]  The Territory includes any county in which PFE operates a store.  It may expand over time to include any new counties in which PFE opens a new store.

**United States District Court**
For the Northern District of California

the jury's award is unsupported by the evidence and seeks entry of judgment as a matter of law

under Rule 50(b)(3), or an alteration of the judgment under Rule 59(e). RC does not request a new

trial.

A.     Legal Standard

    1.     Rule 50

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Under

Rule 50(a)(1),

> [i]f a party has been fully heard on an issue during a jury trial and the
> court finds that a reasonable jury would not have a legally sufficient
> basis to find for the party on that issue, the court may:
>
> (A)     resolve the issue against the party; and
>
> (B)     grant a motion for judgment as a matter of law against the
> party on a claim or defense that, under the controlling law, can
> be maintained or defeated only with a favorable finding on that
> issue.

Fed. R. Civ. P. 50(a)(1). The motion must be made before the case is submitted to the jury and must

"specify . . . the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

The purpose of this requirement is "to call the claimed deficiency in the evidence to the attention of

the court and to opposing counsel at a time when the opposing party is still in a position to correct

the deficit." *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996) (quoting *Lifshitz v. Walter Drake*

*& Sons*, 806 F.2d 1426, 1429 (9th Cir.1986)).

Under Rule 50(b), if the court does not grant the motion for judgment as a matter of law

under Rule 50(a), "the movant may file a renewed motion for judgment as a matter of law and may

include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "A post-

trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed.

R. Civ. P. 50(b), 1991 advisory committee notes; *see also* 9-50 Moore's Fed. Prac. – Civ. §

50.43[3][a] ("A pre-verdict motion serves as a predicate to a post-verdict motion only if the

pre-verdict motion includes the specific grounds asserted in the second motion."). "Allowing trial

courts to set aside jury verdicts on grounds not presented in pre-verdict motions has been held to

constitute an impermissible re-examination of jury verdicts in violation of the Seventh Amendment.

1  [¶] In addition, the application of this rule ensures that the opposition has sufficient notice of the

2  alleged error to permit that party to cure the defect before resting his or her case." *Id.* § 50.43[3][b].

3  *See also Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (stating that this rule

4  "preserves the sufficiency of the evidence as a question of law, allowing the district court to review

5  its initial denial of judgment as a matter of law instead of forcing it to 'engage in an impermissible

6  reexamination of facts found by the jury'" and further "calls to the court's and the parties' attention

7  any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to

8  correct them").

9        If there is substantial evidence to support a jury verdict, the court should deny a motion for

10  judgment as a matter of law. *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)

11  ("A jury's verdict must be upheld if it is supported by substantial evidence.").  "Substantial evidence

12  is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even

13  if it is possible to draw two inconsistent conclusions from the evidence." *Maynard v. City of San*

14  *Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994); *see also Wallace*, 479 F.3d at 624 ("Judgment as a matter

15  of law may be granted only where . . . the evidence permits only one reasonable conclusion, and that

16  conclusion is contrary to the jury's verdict.").  Notably, "the court must not weigh the evidence, but

17  should simply ask whether the plaintiff has presented sufficient evidence to support the jury's

18  conclusion." *Wallace*, 479 F.3d at 624.  Moreover, "[t]he evidence must be viewed in the light most

19  favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that

20  party." *Id.*  The court "must disregard all evidence favorable to the moving party that the jury is not

21  required to believe." *Id.*; *see Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151

22  (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence

23  favorable to the moving party that the jury is not required to believe.") (citations omitted).

24        2.   <u>Rule 59(e)</u>

25        Under Rule 59(e), a party may move to alter or amend a judgment.

26        "Since specific grounds for a motion to amend or alter are not listed in
the rule, the district court enjoys considerable discretion in granting or

27  denying the motion."  But amending a judgment after its entry remains
"an extraordinary remedy which should be used sparingly."  In

28  general, there are four basic grounds upon which a Rule 59(e) motion

4

may be granted: (1) if such motion is necessary  to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law.

*Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).  The party moving for relief has the burden of showing that an amendment is appropriate.  *See Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001) (stating that Rule 59(e) motions "are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances"); *see also Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995) (stating that "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -matters, in other words, that might reasonably be expected to alter the conclusion reached by the court").  RC relies only on the first ground, manifest error.  Mot. at 15.

A manifest error is synonymous with a clear error.  *See Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001) (stating that "[a]mendment or alteration is appropriate under Rule 59(e) if[,] [for example,] the district court committed clear error or made an initial decision that was manifestly unjust").  While "[c]ourts have generally not defined what constitutes 'clear error' under Rule 59(e)," case law indicates that "clear error should conform to a 'very exacting standard'" – *e.g.*, a court should have "'a clear conviction of error.'"  *Piper v. United States DOJ*, 312 F. Supp. 2d 17, 21 (D.D.C. 2004).  Furthermore, as indicated above, the error must be one on which the final judgment was predicated, *see Allstate*, 634 F.3d at 1111; the error must be one that would alter the outcome of the case.  *See Bokel v. NYPD Prop. Clerk Div.*, No. 06-CV-2849 (SLT) (LB), 2008 U.S. Dist. LEXIS 54081, at *4-5 (E.D.N.Y. July 15, 2008) (concluding that the plaintiff "failed to satisfy the burden of showing that this Court . . . overlooked a controlling decision or material fact that would alter the outcome"); *see also* Wright, *et al.*, Fed. Prac. & Proc. § 2810.1 (stating that "amendment of the judgment will be denied if it would serve no useful purpose").  Fed. R. Civ. P. 61 provides for harmless error, *i.e.*, "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order."

1    *See* 12-61 Moore's Fed. Prac. – Civ. § 61.02[2] (stating that, "even if the trial court is mistaken, it

2    will not be reversed unless its ruling results in substantial prejudice, or had a substantial effect on the

3    outcome of the case").

4    B.      Rule 50(b) – JMOL

5            Defendant RC first moved for judgment as a matter of law at the close of Plaintiff's

6    evidence. RT 378:5.  It based its motion on the grounds that the jury had not heard evidence from

7    which it could calculate either the MDA or the PA damages.  Specifically, it argued that there were

8    no numbers in evidence with respect to the PA or MDA, especially in the Expansion Counties, and

9    that while PFE's executives had testified qualitatively about their company's prospects for future

10   growth, the jury did not have sufficient numbers from which to actually calculate any reasonably

11   certain damages.  PFE countered that there was sufficient evidence before the jury on both measures

12   of damages, as PFE's executives had testified as to PA payments due to PFE from 2009-2011 as

13   well as the 2008 MDA payment RC had refused to tender on the date of breach.  PFE also argued

14   that to the extent there was any deficiency in the data before the jury, PFE would request leave to re-

15   open to call additional witnesses and provide such data.  *See* RT 385:12-25.  The Court took the

16   matter under submission and allowed the trial to continue. RT 389:16-22.  After the jury returned its

17   verdict, RC filed this renewed JMOL motion on the same grounds.  Docket No. 170.

18           1.      Portion of the Record Considered

19           As a preliminary matter, RC's motion focuses only on the evidence submitted during

20   Plaintiff's case-in-chief.  RC appears to contend that its Rule 50(a) motion in effect stopped the

21   clock and that the Court's failure to deny it – instead taking the motion under submission – implied

22   that if the Court were to consider the subsequent Rule 50(b) motion, it would be based only on the

23   state of the evidence at the time of the Rule 50(a) motion (*i.e.*, close of Plaintiff's case). *See, e.g.*,

24   Mot. at 4; Reply at 4.  However, a Rule 50(a) motion cannot be granted until a plaintiff has notice

25   and an opportunity to correct deficiencies in its case.  *Waters*, 100 F.3d at 1441 (Rule 50 requires a

26   court to give the nonmoving party a chance to correct deficiencies in its evidence) (citing Fed. R.

27   Civ. P. 50, 1991 adv. comm. note ("In no event, however, should the court enter judgment against a

28   party who has not been apprised of the materiality of the dispositive fact and been afforded an

6

United States District Court

For the Northern District of California

1   opportunity to present any available evidence bearing on that fact.")).  This implies that in ruling on

2   a post-trial Rule 50(b) motion, the court must consider the evidence submitted after the plaintiff

3   received notice (via the Rule 50(a) motion) of potential deficiencies in its evidence.  Courts have so

4   held.  *See Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 645 (6th Cir. 1991) ("Duramed

5   argues that at the close of plaintiffs' case their motion for a partial directed verdict should have been

6   granted . . . . Our review of whether there was evidence that Duramed did not use its best efforts

7   must be based on the *entire* record, *not just the record at the end of plaintiffs' case*, because

8   Duramed proceeded to offer evidence in its own defense.") (citations omitted) (emphasis added);

9   *Peguero-Moronta v. Santiago*, 464 F.3d 29, 33 (1st Cir. 2006) ("If, in fact, the district court

10   examined only the evidence presented in Plaintiffs' case when granting Defendants' renewed Rule

11   50(a) motion, this would be an error of law.").  Professors Wright & Miller explain that even if the

12   court should have granted the initial JMOL motion, "this error is cured if subsequent testimony on

13   behalf of the moving party repairs the defects in the opponent's case."[2]  9 C. Wright & A. Miller,

14   Fed. Prac. & Proc. § 2534 (3d ed. 2011).  Accordingly, in reviewing the Rule 50(b) motion, the

15   Court considers the entire trial record.

16          2.       Law Regarding Damages

17          Under California law, a business may recover future damages for lost profits due to a breach

18   of contract "if their extent and occurrence can be ascertained with reasonable certainty." *Shade*

19   *Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 890 (2000).

20   However, "mathematical precision" is not required in calculating the extent of damages.  *Id.*  Rather,

21   as the Court noted in its pretrial conference order, "when it clearly appears that a party has suffered

22   damage a liberal rule should be applied in allowing a court or jury to determine the amount, and that,

23   given proof of damage, uncertainty as to the exact amount is no reason for denying all recovery."

24   *California Lettuce Growers v. Union Sugar Co.*, 45 Cal.2d 474, 486-87 (1955) (quotation omitted);

25

26          [2]  RC does not cite to any case law in support of its theory that only evidence presented
27   during PFE's case-in-chief may be considered.  To the extent that its citation to *Fisher v. City of San
     Jose* was intended to support this argument, Mot. at 4, *Fisher* does not provide any assistance as it
28   merely explained the legal standard for reviewing 50(a) and 50(b) motions, not the portion of
     evidence considered in conducting that review.  509 F.3d 952, 957 (9th Cir. 2007).

**United States District Court**
For the Northern District of California

1   *see also Hunt Foods, Inc. v. Phillips*, 248 F.2d 23, 33 (9th Cir. 1957) (restating California rule);

2   *Dillingham-Ray Wilson v. City of Los Angeles*, 182 Cal. App. 4th 1396, 1406 (2010) (same).

3   "Uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damage, is

4   fatal.  But the same certainty as to the amount of the damage is not required."  *Israel v. Campbell*,

5   163 Cal. App. 2d 806, 816 (1958); *see also Gunter & Zimmerman Const. Div., Inc. v. S.G.M.E.*

6   *Usine Moser S.A.*, No. C-88-3866, 1992 WL 12602677, at *4 (N.D. Cal. June 3, 1992) (same).

7           In weighing the evidence submitted as to damages, "[i]t is within the sound discretion of the

8   trier of fact to select the formula most appropriate to compensate the injured party."  *Marsu*, 185

9   F.3d at 938, 939 (citing *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 599

10   (1970)).  This flexibility applies even in the case of future damages, *see Parlour Enterprises, Inc. v.*

11   *Kirin Group, Inc.*, 152 Cal. App. 4th 281, 287 (2007) (allowing for testimony as to projected

12   revenues of a new business based on data from the same or similar businesses), and even where

13   future damages may be contingent, *see First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d

14   1058, 1069 (9th Cir. 2011); *Macken v. Martinez*, 214 Cal. App. 2d 784, 790 (1963) ("As defendant's

15   wrongful conduct made the exact ascertainment of damages difficult, he cannot complain because

16   the court must make an estimate of the damage and not an exact computation, provided, of course,

17   that the estimate is a reasonable one.")).  However, "damages which are speculative, remote,

18   imaginary, contingent, or merely possible cannot serve as a legal basis for recovery."  *Piscitelli v.*

19   *Friedenberg*, 87 Cal.App.4th 953, 989 (2001) (internal quotations omitted); *see, e.g.*, *Greenwich*

20   *S.F., LLC v. Wong*, 190 Cal. App. 4th 739, 763 (2010) ("The evidence in this case was insufficient to

21   show that either Chan or Greenwich S.F. were established businesses or had track records of

22   successfully developing or redeveloping properties.").

23           3.      Evidence Presented in Trial

24                   a.      PA Damages

25           First, with respect to the PA damages, RC contends that PFE put on no evidence regarding

26   future PA damages, and therefore that the maximum the jury could have awarded was $635,263, the

27   PA lost between 2009-2011.  Instead, the jury awarded $2,637,651 in PA damages.  Mot. at 14-15.

28   In support of this argument, RC relies heavily on PFE counsel's statement outside the presence of

8

United States District Court

For the Northern District of California

1    the jury that PFE had not projected future PA losses for the jury as they had for future MDA

2    damages.  *See* Mot. at 6 (citing RT 505:4-8).  RC also points to the fact that PFE counsel did not

3    specifically ask the jury in closing arguments for more than the PA damages already incurred.

4    However, as the jury instructions make clear, the lawyers' arguments are not evidence, and the jury

5    was instructed that "If the facts as you remember them differ from the way the lawyers have stated

6    them, your memory of them controls."  9th Circuit Model Civil Jury Instruction 1.7.  The jury was

7    also generally instructed on damages (without RC's objection) in a manner which permitted future

8    damages.  *See* Docket Nos. 146, 150.[3]

9         Moreover, RC fails to credit the evidence actually presented to the jury on this question.  For

10   example, PFE executive Mark Witriol testified as to the magnitude of the PA payments already due

11   PFE from 2009-2011.  He provided data to the jury for each year, and calculated the 15% PA

12   discount for those years.  Specifically, he testified that PFE purchased over $1,585,137 million of

13   RC products post-breach in 2009, $2,108,892 million in 2010, and $541,058 to-date in 2011.  He

14   testified that this represented $635,263 in lost PA payments already incurred.  *See* RT 308:13-309:4.

15   He also projected that the PA discount would increase by 20% year on year due to PFE's increase in

16   sales, which he based on PFE's past sales performance.  RT 332:4-10; 333:22-334:10;

17

18   _____

         [3]  Jury Instruction No. 22 specifically addressed the issue of future damages, stating that the
19   jury, in determining what (if any) damages PFE had proven by a preponderance of the evidence,
     should consider the "amounts that you believe, with reasonable certainty but for the repudiation by
20   RC USA of its Second Agreement with PFE, would have been due from RC USA to PFE under the
     Second Agreement for the period from March 25, 2009, to the date you find that the Agreement
21   would have been terminated, whether by its own terms in 2017 or as a result of PFE's failure to
     increase sales on a year-over-year basis by more than one dollar." RT 513:10-17, Docket No. 168.
22   The parties agreed to this language. RT 503:3-11, Docket No. 168 .  RC's only objection to
     Instruction No. 22 was its position that the phrase "contingent or" should be included in the
23   sentence, "Those damages must be reasonably certain, rather than [contingent or] speculative." *See*
     Docket No. 146.  As the Court explained, the phrase was unnecessary and potentially confusing
24   because "California case law recognizes that if a plaintiff can prove contingent damages to a
     reasonable degree of certainty, they are permissible."  *See* Order Re Jury Instruction 22, Docket No.
25   150, at 1 (citing *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002) ("But although
     generally objectionable for the reason that their estimation is conjectural and speculative, anticipated
26   profits dependent upon future events are allowed where their nature and occurrence can be shown by
     evidence of reasonable reliability.").  Beyond this dispute, RC accepted (and indeed, helped craft)
27   the language above, which asked the jury to consider what future damages were PFE under both the
     PA and MDA prongs of the contract.  *See* RT 390-98, Docket No. 162 (discussing ways to clarify
28   Instruction 22 and asking the parties to meet and confer regarding proposed changes); RT 503:3-11,
     Docket No. 168 (accepting the parties' revised language).

United States District Court

For the Northern District of California

335:17-336:11.  More generally, Mr. Witriol voiced confidence in the fact that PFE would be able to continue purchasing more RC product every year due to its past and projected future growth, and that a 5-7% growth rate per year was the baseline.  *See* RT 297:12-298:21.

Beyond the numbers, both PFE executives testified qualitatively as to the success of PFE in the past and through the present, even during the recession.  While that testimony did not provide specific data to the jury, viewed in the light most favorable to PFE, it bolstered the credibility of the numbers and projections PFE witnesses did offer.  For example, Mr. Levy testified as to the success of PFE and its intentions to open new stores.  *See, e.g.*, RT 230-32; 239:13-19 (describing how PFE has doubled its holding capacity in its warehouse to enable its expansion); 231:13-17 (relatively new Walnut Creek store is doing very well); 243:8-13 (Antioch store is doing very well); 260:22-25 (the company's sales of RC products grew every year); 345:6-15 (sales went up even during the recession).  Mr. Witriol also testified about PFE's growth from just 3 stores to 38, with additional new stores in the works.  *See* RT 284:24-285:5.  He explained the basis for PFE's success and his corresponding belief that it would continue to do well by describing the company's "influencer" model of sales, whereby PFE worked with breeders, veterinarians, and others to ensure that they were recommending certain products, including RC products.  *See, e.g.*, RT 288:12-289:20.  RC's Mr. Flanigan confirmed that this sales strategy is what is effective for RC products.  RT 413:17-418:14.

RC contends that PFE purchased less of RC products after the breach, suggesting that even absent breach, PFE may not have been able to meet its obligations to continue purchasing more RC product each year.  In response, Mr. Levy testified that PFE directed customers away from RC products as a result of the breach, thus leaving the jury with the rational inference that absent breach, PFE would have continued to promote RC products more aggressively and maintained its strong sales.  *See* RT 259:5-260:16.  Mr. Witriol supplemented this testimony with additional explanations as to how PFE could have continued to promote RC products absent breach, but did not do so because of RC's conduct in breach of the contract.  *See* RT 288:15-24 340:6-341:25; 342:25-346:13.

In addition to the evidence presented during PFE's case-in-chief, Mr. Rudolph, an accountant who manages RC's books, testified that RC had increased their prices in recent years due to

United States District Court

For the Northern District of California

1   significant increases in commodity prices.  This supports the inference that PFE would be able to

2   maintain its dollar-level purchase obligations even if it suffered a decline in the volume of business.

3   *See* RT 469:3-471:5.  Mr. Rudolph also sponsored Exhibit 101, which provided data on RC's sales

4   to PFE from 2004 to 2010 and provided the jury a substantial baseline from which to evaluate PFE's

5   proffered testimony about expected sales growth in the future.  *See* RT 475:3-4.  That data showed a

6   24-33% increase per year in PFE's purchases of RC product before the breach.  In 2009 and 2010,

7   Exhibit 101 showed decreases in purchases of RC products both from PFE and other retailers.

8   While Mr. Levy and Mr. Witriol attributed this decline to RC's breach and PFE's consequent efforts

9   to divert customers to other products, RC attributed the decline to the recession.  *Compare* RT

10  343:3-345:22, *with* RT 429:8-430:6.  But this disagreement in interpreting the figures does not

11  negate the requirement that the facts and reasonable inferences therefrom must, in the context of this

12  Rule 50 motion, be drawn in PFE's favor.

13              b.    <u>MDA Damages</u>

14          As for the MDA damages, Mr. Witriol testified that the 2008 MDA payment should have

15  been $309,000.  RT 323:6-7; 355:25.  Mr. Flanigan later confirmed the more specific total for the

16  2008 MDA, $309,894.  RT 437:8-14; 441:1-10; *see also* TX 15.  Mr. Rudolph further testified that

17  the MDA payments for 2009 and 2010 would total $524,761.  RT 490:22-491:3.  Each of these data

18  points are supported by RC's Exhibit 101, which was introduced during Mr. Rudolph's testimony

19  and showed the data for RC's sales which were subject to the 5% MDA calculations.  RT 477:15-18.

20  Accordingly, even without any future projections, the jury had before it $834,656 of MDA damages

21  from 2008-2010.  The jury also learned that RC's MDA-eligible sales grew 7 percent from 2009 to

22  2010.  RT 357:19-358:3; *see also* Exhibit 101.  Mr. Witriol testified that in Northern California, PFE

23  would continue to grow (and hence, so would RC's sales); he offered an estimated growth rate of

24  25% and explained why he thought it was accurate, based largely on his past experience with PFE

25  and their newfound ability to get access to prime real estate at reduced cost.  *See* RT 309:21-310:19;

26  336:4-339:8.  He also traced PFE's performance to RC's overall sales by stating that PFE's

27  "influencer" model pushed sales of RC products throughout the Territory, not just in PFE stores.

28  *See* RT 288:12-289:20.  He explained further that PFE kept abreast of RC's performance in the

United States District Court

For the Northern District of California

1    Territory because of its MDA payments and its relationship with RC sales representatives.  RT

2    296:16-297:11.  In addition, Mr. Flanigan testified that RC was continuing to grow and that they

3    have hired new associates even during the recession.  RT 413:1-7.  He also testified that their sales

4    have been strong in 2010 and 2011, including a 30% increase in the covered Territory thus far in

5    2011.  RT 431-32.  Mr. Rudolph further testified that RC's growth was in the high teens and up to

6    25% in the years before the recession, that it was in single digits in 2008 and 2009, and that it was in

7    low double digits in 2011.  *See* RT 467:23-268:4.

8            4.        Sufficiency of the Evidence

9            Examining the record as a whole, there was sufficient evidence before the jury to support an

10   award of $2.6 million in PA damages and $1 million in MDA damages.  There was a quantitative

11   basis for the jury to take into account PFE's future sales of RC products based on evidence as to

12   expected growth in PFE's sales of RC products and the PA amounts which had accrued in 2009-

13   2011.  The Court notes that Mr. Witriol testified that PFE purchases of RC products in 2010 were

14   $2,108,892, which yields a 15% PA of $316,334.  *See* RT 308:13-309:4.  If the jury accepted this

15   figure as an annual PA amount with no future increases, over 8 years between 2010 and 2017 and

16   adding the 2009 post-breach PA, PA damages would have been equal to over $2.7 Million.[4]  While

17   this scenario would only allow for a minimal discount rate, the jury could well have believed Mr.

18   Witriol's and Mr. Levy's testimony that PFE's future growth and sales of RC products but for RC's

19   breach.  Such a credibility determination was within the jury's province.  *See Winarto v. Toshiba*

20   *Am. Elec. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) ("[T]he court must accept the

21   jury's credibility findings consistent with the verdict.") (quotations omitted).  The Court cannot

22

23           [4] The Court notes that, as RC has pointed out, *see* Mot. at 6 & n.7, PFE's 2010 figure
     corresponds with RC's Ex. 101, but Ex. 101 lists the $2.1 mil. figure as corresponding to 2009,
24   rather than 2010.  RC's figures for 2010 were lower.  However, as RC concedes, this was the
     evidence before the jury.  Moreover, whether the figure actually corresponds to 2009 or to 2010 is
25   largely irrelevant.  If the jury accepted Ex. 101's version of the data, it could well have used the $2.1
     mil. figure as a baseline beginning in 2009.  Because Mr. Witriol's 2009 PA figure was lower than
26   the figure presented by RC in Ex. 101, such a scenario would lead to an even higher figure than the
     $2.7+ mil. noted above.  Indeed, the jury could also have used RC's 2008 data ($2,348,511) as a
27   baseline for its PA calculations, as that was the last year pre-breach.  This would have resulted in an
     even higher award (and allowed for a more robust discount rate to calculate present discounted
28   value).  Thus, the bottom line is that the data presented to the jury allowed for ample room to reach
     its verdict.

United States District Court

For the Northern District of California

1   conclude no reasonable jury could have awarded the PA damages this jury awarded.  *See Wallace*,

2   479 F.3d at 624 ("Judgment as a matter of law may be granted only where, so viewed, the evidence

3   permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.")

4   (citing *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000)).

5          Similarly, the MDA damages awarded were well within the range of reasonableness based on

6   the testimony offered.  While RC is correct that PFE abandoned its claim for future revenues based

7   on the MDA payments in Expansion Counties, *see* RT 513:21-22, that does not negate the probative

8   value of Exhibit 101 and the data it offered the jury as to past sales of RC products, both by PFE and

9   other retailers, within the existing Territory.   Nor does it negate the relevance of PFE's proffered

10  testimony regarding PFE's prospects for future growth and RC's corresponding increased sales

11  within the Territory.  In contrast to RC's contention that Mr. Witriol's MDA testimony was

12  premised on PFE's growth in the Expansion Counties–a theory of damages PFE later

13  abandoned–Mr. Witriol was sufficiently clear that he expected growth in Northern California as

14  well, and that his projections were based on PFE's past experience in Northern California.  *See* RT

15  309:21-310:19.[5]  Moreover, even if the jury fully credited Mr. Rudolph's testimony over PFE's

16  regarding the growth rate for the MDA (especially post-recession), those more modest growth

17  numbers would more than sustain the MDA damages awarded by the jury.  Finally, as described

18  above, by RC's own admission, its business was strong enough to support increased sales within the

19  Territory, which would have resulted in MDA payments to PFE but for its breach.  Indeed, the jury's

20  award reflects less than $300,000 in future MDA damages that PFE had not already incurred and

21  calculated with specificity;  in short it was a modest award.  *See Marsu, B.V. v. Walt Disney Co.*,

22  185 F.3d 932, 938, 939 (9th Cir. 1999) (finding that the court had exercised its discretion

23  appropriately by "considering several possible theories for determining damages" and "declining to

24  _____

25          [5]  RC offers one plausible, contested argument for how the jury could have interpreted the
    evidence before it regarding MDA damages; *i.e.*, that Mr. Witriol was insufficiently clear about the
26  basis for his rosy estimates of a 25% future growth rate, and that "it would be logical to infer that"
    Mr. Witriol's estimate was based largely on the Expansion Counties (for which PFE later disclaimed
27  damages).  Mot. at 9-10.  However, these are not the only logical interpretations of the evidence
    presented, and drawing all inferences in Plaintiff's favor leaves sufficient room for the jury to reach
28  the conclusion it reached.

13

1    award compensation where it felt calculations were impermissibly speculative") (citing *United*

2    *States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 599 (1970)).

3           RC contends that the evidence presented at trial was nonetheless too speculative to support

4    the jury's verdict.  However, the bulk of the evidence presented as to PFE's future damages was

5    based on PFE's own past experience with RC products, which is an accepted basis under California

6    law.  *See Grupe v. Glick*, 26 Cal.2d 680, 692 (1945) ("[W]here the operation of an established

7    business is prevented or interrupted, as by a tort or breach of contract or warranty, damages for the

8    loss of prospective profits that otherwise might have been made from its operation are generally

9    recoverable for the reason that their occurrence and extent may be ascertained with reasonable

10   certainty *from the past volume of business* and other provable data relevant to the probable future

11   sales.") (emphasis added).  Indeed, a case on which Defendant relies, *Piscitelli v. Friedenberg*,

12   demonstrates this principle.  87 Cal. App. 4th 953 (2001).  In *Piscitelli*, the California Court of

13   Appeal concluded that, in a legal malpractice action, the plaintiff's claim for lost commissions on

14   money management accounts was largely not speculative.  *Id.* at 990.  Plaintiff's claimed damages

15   calculation assumed that he would have retained a major account with the same commission but for

16   his depression and derogatory remarks on his record (purportedly caused or not solved by the

17   underlying litigation).  The court found that this assumption was not speculative as it was supported

18   by testimony from the representative of that account that plaintiff would have kept the account

19   because he had done a good job in the past.  The representative further testified that $22-25 million

20   was subsequently added into the account, which the court found sufficient to incorporate into

21   plaintiff's claimed lost commission.  The only claim the Court found speculative was plaintiff's

22   assumption that the account would have doubled to $50 million within 18 months, which the Court

23   could not connect to *any* supporting evidence.  *Id*.  By contrast, in the instant case, the modest future

24   damages the jury awarded PFE are supported by specific testimony regarding the company's past

25   success, the reasons for its projected future performance, and corroborating testimony and data from

26   RC's employees.

27          *Toscano v. Greene* and *Kids' Universe v. In2Labs*, also cited by RC, are similarly

28   distinguishable.  In *Toscano*, the court concluded that plaintiff's lost future earnings were too

United States District Court

For the Northern District of California

1   speculative where plaintiff's expert had simply assumed plaintiff would continue working at a

2   comparable salary until his retirement notwithstanding the fact that plaintiff's employment was at-

3   will, his boss could have fired him for any reason at any time, and his boss did not testify as to any

4   intention to retain him.  124 Cal. App. 4th 685, 696-97 (2004).  By contrast, here PFE's business

5   relationship with RC was not at-will, it was governed by a contract the fulfillment of which was in

6   PFE's control and with which PFE had never had trouble upholding before RC's breach.  Similarly,

7   in *Kids' Universe*, the court found testimony insufficient to demonstrate lost profits where a small

8   toy store claimed that flood damage to the store caused by defendant led to $50 million in lost

9   profits because Plaintiff's new website would have allowed it to compete in the Internet toy

10  marketing business.  95 Cal. App. 4th 870, 887-888 (2002).  The lost profits were speculative

11  because the toy store had never before operated its website "as a profit-producing venture," and the

12  online toy market "was not an established one."  *Id.* at 887; *see also Cal. Diesel & Equip., Inc. v.

13  Sun Exploration & Prod. Co.*, 917 F.2d 1307, at *4 (9th Cir. 1990) (finding damages speculative

14  where plaintiff claimed damages on an undeveloped vacant lot, the real estate market was uncertain,

15  and plaintiff was unfamiliar with the business it sought to develop); *Sebastian Int'l, Inc. v.

16  Russolillo*, No. CV 00-3476 SVW JWJX, 2005 WL 1323127, at *9 (C.D. Cal. Feb. 22, 2005)

17  (finding damages speculative "in the absence of any evidence that would allow the jury to determine

18  that Plaintiff's loss was caused by diversion by these Defendants and not another cause").  Pet Food

19  Express, in contrast, has operated 38 successful stores and presented data about its past successful

20  performance under the very same business arrangement through which it sought future damages.[6]

21

22      [6]  RC cites additional cases in its reply that are similarly unhelpful.  In *California Shoppers*,
    for example, the plaintiff's damages were based on purported lost profits from the use of assets that
23  it had been forced to sell too early; the court found the projected damages speculative where "[n]o
    financial documents reflecting its profit and loss history or its profit projections were presented" and
24  "[t]he evidence which was introduced showed that California Shoppers had consistently operated in
    the red."  *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 62 (1985).
25  Similarly, in *Earp v. Nobmann*, the claimed damages from loss of the use of funds due to a delayed
    real estate deal were speculative because "[n]o evidence was introduced to establish how the loss of
26  the use of the funds either cost Harbor out of pocket expenses or resulted in lost profits."  122 Cal.
    App. 3d 270, 295 (1981).  These cases are inapposite not only because they deal with the loss of use
27  of assets and funds, rather than simply a failure to pay money owed, but also because in the instant
    case, PFE presented data about its profit history and projections, and explained how RC's breach
28  had cause it damage.

1   Such testimony is not speculative. *See Parlour*, 152 Cal. App. 4th at 293, 288 (plaintiff's projected

2   revenues for a Santa Clarita restaurant based on "the actual revenues and growth rate" of that

3   restaurant were reasonably certain because "[a] plaintiff's [or a third party's] prior experience in the

4   same [or similar] business has been held to be probative; as has a plaintiff's [or a third party's]

5   experience in the same [or similar] enterprise subsequent to the interference") (internal citations

6   omitted).  Accordingly, the evidence presented was sufficient to sustain the jury's verdict.

7           5.      Judge Patel's Prior Order

8           RC attempts to use Judge Patel's previous commentary on the quality of certain evidence

9   presented by PFE as an indication that the evidence was unreliable.  *See* Mot. at 12.  However, this

10  argument is unavailing for three reasons.  First, Judge Patel was evaluating PFE's evidence in the

11  context of a prejudgment writ of attachment in July of 2009, less than four months after PFE filed

12  suit.  *See* Docket No. 42.  As she noted in that order, a prejudgment attachment may be issued only

13  if the claim sued upon is: (1) for money based upon a contract, express or implied; (2) of a fixed or

14  readily ascertainable amount not less than $500; (3) either unsecured or secured by personal

15  property, not real property (including fixtures); and (4) commercial in nature.  Cal. Civ. Pro. Code §

16  483.010; *Goldstein v. Barak Const.*, 164 Cal. App. 4th 845, 852 (Cal. App. 2008).  The Court must

17  also determine, among other requirements, that the plaintiff has established the "probable validity"

18  of the claim upon which the attachment is based, meaning the plaintiff must demonstrate that "it is

19  more likely than not that the plaintiff will obtain a judgment against the defendant on that claim."

20  Cal. Civ. Pro. Code §§ 481.190, 484.090(a); *see also Kemp Bros. Construction, Inc. v. Titan Electric*

21  *Corp.*, 146 Cal. App. 4th 1474, 1476 (Cal. App. 2007).  Judge Patel unsurprisingly determined that

22  PFE's requested attachment of $19,575,000 – nearly $16 million more than the jury awarded in this

23  case – was not "fixed or readily ascertainable" on the basis of only Mr. Witriol's four-paragraph

24  declaration.  She also noted that given RC's illegality defense (which the Court later rejected on

25  summary judgment), PFE could not establish the probable validity of its claim.  Thus, she concluded

26  that PFE had failed to qualify for the "very limited circumstances" under which prejudgment

27  attachments were appropriate.  *See* Docket 46 at 7.

28

1    Second, Judge Patel's pretrial ruling says little, if anything, about the sustainability of the

2    jury's verdict after a trial.  As discussed above, this court has examined RC's arguments in light of

3    the actual trial evidence.

4    Third, the jury need not have accepted Mr. Witriol's predictions to support its verdict.

5    Indeed, it is apparent that the jury did not fully credit Mr. Witriol's testimony, as it awarded much

6    less than the $13,842,789 PFE sought in closing arguments (which was already a substantially

7    smaller sum than the $19.5 million PFE had sought as a prejudgment writ of attachment).  *See* RT

8    522:12.  Accordingly, RC's argument based on Judge Patel's early comments is unpersuasive and

9    inapposite.

10        6.    Admissibility of PFE's MDA Projections

11    RC also challenges the admissibility of certain evidence considered above and at trial.

12   Specifically, it challenges Mr. Witriol's testimony regarding future MDA payments, contending that

13   he crossed the line from Fed. Rule of Evidence 701 into Rule 702 expert testimony when he offered

14   predictions of future MDA payments because these payments are based on RC's total sales in the

15   Territory.  Mot. at 10.  The Court has wide discretion in making evidentiary determinations.  *See*

16   *Gen'l Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997) ("[I]t is very much a matter of discretion with

17   the court whether to receive or exclude the evidence.").  In addition, for purposes of a Rule 50(b)

18   motion, "a district court should not exclude evidence erroneously admitted at trial. The record

19   should be taken as it existed when the trial was closed."  *Elbert v. Howmedica, Inc.*, 143 F.3d 1208,

20   1209 (9th Cir. 1998).

21    In any event, Mr. Witriol's testimony did not run afoul of this Court's pretrial conference

22   order setting the boundaries of lay opinion testimony.  As the Court explained in that order, Rule

23   701 permits lay witnesses to offer opinion testimony if it is "rationally based on the perception of the

24   witness," "helpful to . . .  the determination of a fact in issue," and "not based on scientific,

25   technical, or other specialized knowledge."  Despite the rule's general limits on lay opinion

26   testimony, business owners are qualified to testify about their companies' projected profits or losses

27   due to their "particularized knowledge . . . by virtue of [their] position in the business."  Rule 701,

28   adv. comm. note, ¶ 4 (2000) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1161 (3d Cir.

**United States District Court**

For the Northern District of California

**United States District Court**
For the Northern District of California

1993) (allowing business owner to present damage report regarding future profits business would have made over ten years, including through as-yet unopened businesses, but for breach of product supplier). *See Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2008 WL 504098, at *4 (N.D. Cal. 2008) (noting that the business owner exception has survived the 2000 amendments to Rule 701); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir.1995) ("[A] president of a company, such as Cook, has personal knowledge of his business . . . sufficient to make . . . him eligible under Rule 701 to testify as to how lost profits could be calculated.") (internal citations and quotation marks omitted), *cert. denied*, 516 U.S. 1114 (1996); *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98 (2d Cir. 2002) (allowing a computer programmer to testify about the meaning of copyright registration terms about which he had personal knowledge); *United States v. Munoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007) (allowing a bank employee to testify about banking practices due to his "knowledge and participation in the day-to-day affairs of [the] business.") (quotation omitted); *In re Merritt Logan, Inc.*, 901 F.2d 349, 359-60 (3d Cir. 1990) (allowing Rule 701 testimony by the principal shareholder concerning the company's lost profits); *Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (allowing company employee "to testify about the lost profits caused by the defective compressor train"). Thus, when a business owner has personal knowledge of the company's past performance, he or she is not necessarily precluded from testifying as to projected future business of the company. *Hynix*, 2008 WL 504098 at *4 (citations omitted).

*Lightning Lube* is instructive on this issue. 4 F.3d 1153 (3d Cir. 1993). In that case, the owner was permitted to testify as to (1) profits he would have earned on 117 franchise contracts had he not been forced to sell them prematurely; and (2) ten years of projected future damages from franchised stores that never opened due to his motor-oil supplier's breach. *Id.* at 1174-75. The witness was able to use highly beneficial assumptions regarding the purported future success of those businesses – he predicted that he would have sold 370 more franchises over ten years, that all of them would have opened, and that he would have earned over $40 million from them – and he was permitted to rely partly on information provided by an accountant. *Id.* Similarly, in *A&M Produce*, the plaintiff was starting a tomato crop, which he had never done before. 135 Cal. App. 3d

473 (1982).  He purchased a machine from the defendant to use in processing the crop, which malfunctioned and destroyed the crop.  The court held that plaintiff could present evidence of lost profits even though he had no historical data from past tomato crops.  *Id.* at 493-94.  Instead, the court found, it was sufficient for the plaintiff to provide evidence regarding the size of the crop and general market price for that type of tomato, the fact that he was an experienced farmer, the condition of the tomatoes pre-harvest, and the fact that there was no indication anything else would have ruined the crop had the machine functioned properly.  *Id.*

PFE's executives offered testimony as grounded, if not more so, than either *Lightning Lube* or *A&M Produce*.  Although Mr. Witriol's MDA testimony touched on RC's business–not merely PFE's own business–within the Territory, these predictions were nonetheless based on his own personal experience running PFE.  Mr. Witriol testified that PFE's "influencer" sales model had boosted RC's sales Territory-wide, and correspondingly, that PFE's failure to promote RC products post-breach was responsible for RC's lower subsequent sales. RT 288:12-289:20; 344:17-345:22. Similarly, he testified that PFE's growth would be to the benefit of RC"s overall sales in the Territory.  RT 336:6-11.  He also explained that he has knowledge of Petsmart's (whose sales within the Territory contributed to PFE's MDA) public statements, which indicate its plans for growth, and that his realtors are in touch with them.  RT 337:10-338:6.  With respect to Petco (whose sales within the Territory also contributed to PFE's MDA) , Mr. Witriol knew of their plans for growth as well. RT 338:7-25.  Accordingly, Mr. Witriol provided a sufficient foundation of personal knowledge and information he gleaned through his business experience to offer a lay opinion about future MDA damages.

Accordingly, the Court **DENIES** RC's JMOL motion.

7.      Rule 59(e) – Alteration of Judgment

In its alternative motion to alter or amend judgment, RC claims manifest error.  RC challenges the jury's reliance on "speculation" in calculating both the PA and MDA damages.  In addition, RC argues that the Court should reduce or vacate the verdict in light of PFE's fraud on the Court with respect to apparently illegitimate documents PFE submitted in support of its claim that it was opening a store in New York.  *See* Mot. at 15-16.

1    With respect to the first argument, RC's motion to alter judgment is based on the same

2    premise as its JMOL motion – that is, that there is insufficient evidence to support the size of the

3    jury's damages award.  It thus rises and falls on the analysis above, as a verdict supported by

4    substantial evidence cannot constitute "manifest error."  *Allstate*, 634 F.3d at 1111.  Accordingly,

5    the Court **DENIES** the motion for the reasons stated above.

6    With respect to RC's second basis for its request – the purported fraud PFE committed on the

7    Court through its attempt to use fake documents regarding expansion plans to New York – the Court

8    has discretion to dismiss a case or order sanctions when a party submits fraudulent documents.  *See,*

9    *e.g., Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337 (9th Cir. 1995) ("A

10   dismissal pursuant to the court's inherent power and Rule 37 is reviewed for an abuse of discretion"

11   and is appropriate where "the conduct to be sanctioned must be due to willfulness, fault, or bad

12   faith") (internal citations and quotation marks omitted).  However, RC provides no new information

13   or analysis that would render the admittedly troubling events surrounding the New York evidence

14   more clear; instead, RC relies more on implication and inference than evidence.  *See, e.g.*, Mot. at 20

15   (concluding that "the entire transaction [*i.e.*, the purported negotiations for New York office space]

16   was a sham" based on RC's answers to the investigative hypothetical: "Who benefits?").  Thus,

17   while there was sufficient information for the Court to refer the case to the U.S. Attorney, there does

18   not appear to be sufficient information to conclusively determine that fraud has occurred and if so,

19   by whom.  Relying simply on circumstantial evidence of motive to imply that PFE willfully

20   committed fraud on the Court is insufficient.  More significantly, the New York transaction became

21   irrelevant to this case and the jury's award when PFE withdrew its claim for MDA damages in New

22   Territories.

23   Accordingly, the Court **DENIES** RC's request for relief under Rule 59.  It does so without

24   prejudice to RC's ability to bring a new motion for sanctions based on additional evidence.

25   ///

26   ///

27   ///

28   ///

United States District Court
For the Northern District of California

**III.    CONCLUSION**

For the foregoing reasons, the Court **DENIES** RC's motion for judgment as a matter of law under Rule 50(b) and **DENIES** its request for relief under Rule 59.

This Order disposes of Docket No. 170.


IT IS SO ORDERED.


Dated:  December 8, 2011

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California